**SONGBYRD, INC., Plaintiff–Appellant,**

v.

**ESTATE OF Albert B. GROSSMAN, doing business as Bearsville Records, Inc., Defendant–Appellee.**

**Docket No. 98–9544**

United States Court of Appeals, Second Circuit.

Argued: Nov. 29, 1999

Decided: March 10, 2000

Justin Asher Zitler, New Orleans, LA. (Heslin, Rothenberg Law Firm, Albany, N.Y., on the brief), for plaintiff-appellant.

Mario D. Cometti, Ryan & Smallacombe, LLP, Albany, N.Y., for defendant-appellee.

Before: VAN GRAAFEILAND, NEWMAN, and POOLER, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal concerns a congeries of issues relating to (1) the procedure to be followed in challenging a district court's transfer order, (2)·the existence of personal jurisdiction, and (3) the accrual of a cause of action under New York law for wrongful possession of a chattel. The issues arise on an appeal by SongByrd, Inc., from the October 21, 1998, order of the United States District Court for the Northern District of New York (David R. Homer, Magistrate Judge) rejecting as time-barred a suit brought against the estate of Albert B. Grossman, doing business as Bearsville Records.[1] SongByrd's suit sought to establish ownership of master recording tapes made by Henry Roeland Byrd, a New Orleans rhythm-and-blues pianist and composer. We conclude that personal jurisdiction was lacking in Louisiana, where the suit was originally brought, that it was properly transferred to the Northern District of New York, and that the suit is time-barred. Accordingly, we affirm.

## Background

### A. Facts

The complaint and supporting documents alleged the following historical facts, which are undisputed for purposes of the challenged ruling that the suit is time-barred.[2] The late Henry Roeland Byrd, known professionally as "Professor Longhair," enjoyed some success as a recording artist in New Orleans in the 1940s and 1950s. In 1971 he was discovered working in a New Orleans record store by Arthur "Quint" Davis, who needed performers for the New Orleans Jazz and Heritage Festival, known as "JazzFest," which Davis and others had organized. Byrd became a star attraction of JazzFest until his death in 1980.

Early in the 1970s, Davis and attorney Parker Dinkins arranged for Byrd to make several master tapes in a Baton Rouge studio. After hearing demo tapes produced from these master recordings, Albert Grossman, president of Bearsville Records, Inc., in Woodstock, New York, arranged with Davis and Dinkins for Byrd and another New Orleans musician to travel to Woodstock for a recording session. The results of that session were unsatisfactory, and thereafter Davis sent the master tapes to Grossman. According to an uncontradicted affidavit of Davis, the tapes were delivered "as demonstration tapes only, without any intent for either Albert Grossman or Bearsville Records Inc. to possess these aforementioned tapes as owner."

The tapes remained in Grossman's possession. Dinkins, acting on behalf of Davis .and Byrd, wrote two letters to Bearsville Records, Inc. in 1975 requesting return of the master recordings. It is not clear whether the letters were ever received. In any event, Bearsville Records, Inc. made no response, and Dinkins did not pursue the matter.

---

**1.** The caption of the case in this Court refers to Grossman's estate doing business as "Bearsville Records, Inc." In the earlier, related Fifth Circuit case, the estate was identified as doing business as "Bearsville Records." *See Songbyrd, Inc. v. Bearsville Records, Inc.,* 104 F.3d 773, 774 (5th Cir. 1997) .("*Songbyrd I*"). The latter designation appears to be more accurate since Bearsville Records, Inc., has been dissolved. *See id.* at 775. The transfer order entered by the District Court for the Eastern District of Louisiana also noted that the case caption's reference to the estate as doing business as Bearsville Records, Inc. is incorrect.

**2.** A more extensive factual history is set forth in a Fifth Circuit opinion at an earlier stage of this litigation. *See Songbyrd I,* 104 F.3d at 774–75.

After Grossman died in 1985, Bearsville Records, Inc., was dissolved, but Grossman's estate ("the Estate") continued doing business as Bearsville Records and continued in possession of the master tapes.[3] The Estate did not produce any records itself, but licensed recordings and made its studio available for rental to musicians. In 1986, as part of its licensing business, the Estate licensed some of the Byrd master recordings to Rounder Records Corporation ("Rounder") of Cambridge, Mass., for an advance against royalties. In 1987, Rounder released an album of Byrd's recordings, which garnered Byrd a posthumous Grammy Award for Best Traditional Blues Album of 1987. The Estate also licensed some of the master recordings to Rhino Records ("Rhino"), which released an album in 1991 with seven tracks from the Byrd master recordings.

In 1993, SongByrd, Inc. was incorporated as a successor-in-interest to the intellectual property rights of Byrd and his deceased widow.

### B. Proceedings in Louisiana

On August 14, 1995, SongByrd filed a "Petition in Revendication" against the Estate in the Civil District Court for Orleans Parish, Louisiana. The petition sought a declaration that SongByrd owned the master tapes, return of the tapes, $50,000 in damages (the amount of the licensing fees allegedly already paid as an advance on royalties), substitution of SongByrd in any

of the Estate's existing licensing agreements, and interest, fees, and costs.

The Estate removed the case to the United States District Court for the Eastern District of Louisiana (G. Thomas Porteous, Jr., District Judge) on diversity grounds, the jurisdictional amount for which was then $50,000.

In its answer, the Estate asserted two affirmative defenses: (1) lack of personal jurisdiction under the Louisiana long-arm statute, and (2) the action was time-barred. The Estate's Rule 12 motion to dismiss was treated as a motion for summary judgment because the parties submitted numerous affidavits. Explicitly declining to consider the personal jurisdiction issue, the District Court dismissed the suit on the ground that the action was time-barred. On appeal, the Fifth Circuit reversed, ruling that the District Court had erroneously upheld the Estate's time-bar defense on the record then made. *See Songbyrd I,* 104 F.3d at 781. The Fifth Circuit remanded for further consideration of the time-bar defense,[4] and to permit initial consideration of the personal jurisdiction issue. *See id.*

On remand, the Louisiana District Court entered a brief order (1) reflecting that the Court had found that it lacked personal jurisdiction over the Estate and (2) *sua sponte* transferring the action to the District Court for the Northern District of New York.

---

**3.** The plaintiff's complaint recounts the unusual circumstances under which the tapes went from Grossman's possession to that of his estate: "Upon information and belief, tragically dying *en route* [from a European music conference], Albert Grossman lay in state [*sic*] at Heathrow Airport in London. Upon claiming the corpse, Sally Grossman, widow of Albert Grossman, discovered the Baton Rouge recording session tapes clutched to the deceased body." Complaint ¶XVII.

**4.** Applying provisions of Louisiana's Civil Code, the Fifth Circuit ruled that SongByrd's suit seeking recognition of ownership of movable property was an "innominate real ac-

tion" and that the applicable "prescription" (type of limitations) was "acquisitive" and not "liberative." Therefore, only adverse possession with notice and not merely the lapse of a specified time interval without a claim could defeat SongByrd's ownership claim. On the then-existing record, the Court ruled that SongByrd's contention that the Estate was only a "precarious possessor" (bailee) of the tapes had not been rebutted. The Court noted that the Estate could still defeat SongByrd's claim by showing "acquisitive prescription," *i.e.,* actual notice to the public and SongByrd that the Estate intended to possess the tapes as owner. *See SongByrd I,* 104 F.3d at 777–81.

## C. Proceedings in the Northern District of New York

After the transfer, the parties agreed to adjudication by a magistrate judge, *see* 28 U.S.C. § 636(c) (1994), and the transferred action was assigned to Magistrate Judge Homer. On the Estate's motion for summary judgment, Magistrate Judge Homer ruled that (1) New York law applied because the ground for the transfer was that the Louisiana District Court lacked personal jurisdiction over the Estate, (2) the pertinent limitations period was New York's three-year limitations period for conversion and recovery of chattels, *see* N.Y. C.P.L.R. 214(3) (McKinney 1990), (3) SongByrd's action accrued no later than August 1986 when Bearsville licensed the master tapes to Rounder, and (4) the suit, filed in 1995, was time-barred. *See Songbyrd, Inc. v. Estate of Albert B. Grossman,* 23 F.Supp.2d 219, 221–23 (N.D.N.Y.1998) (*"SongByrd II"*).

## Discussion

### I. The Transfer Order from the Eastern District of Louisiana

Although SongByrd has not explicitly challenged the transfer order, its challenge to the Louisiana court's ruling that personal jurisdiction over the Estate was lacking implicates the transfer ruling, which was based solely on lack of personal jurisdiction. Moreover, uncertainty in the law of this Circuit concerning the proper procedure to be followed in challenging a transfer order makes it appropriate to give the matter some consideration. Four issues arise: (1) Is the transfer order reviewable in the transferor circuit? (2) If not reviewed in the transferor circuit, is it reviewable in the transferee circuit? (3) If review in the transferee circuit is proper, is a retransfer motion in the transferee district court required to preserve the transfer issue for appeal? (4) Where the transfer is ordered for lack of personal jurisdiction, what must the party opposing transfer show in order to have the transferee circuit reach the merits of the personal jurisdiction ruling?

### 1. Reviewability

■■■ A transfer order is an interlocutory order that is not immediately reviewable by appeal. *See D'Ippolito v. American Oil Co.,* 401 F.2d 764, 764–65 (2d Cir.1968); 17 *Moore's Federal Practice* § 111.60[1] (3d ed. 1999) (*"Moore"*). Review of transfer orders by writ of mandamus in the transferor circuit might be available,[5] but the Fifth Circuit, to which SongByrd might have petitioned, rarely grants such review, *see* 15 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal*

---

**5.** Our Court has acknowledged the availability of review of a transfer order in the transferor circuit by petition for mandamus, but has also been markedly reluctant to grant the writ. *See Pfizer, Inc. v. Lord,* 447 F.2d 122 (2d Cir.1971); *Golconda Mining Corp. v. Herlands,* 365 F.2d 856 (2d Cir.1966); *A. Olinick & Sons v. Dempster Brothers, Inc.,* 365 F.2d 439 (2d Cir.1966). Judge Friendly deemed mandamus unavailable to review a district judge's exercise of discretion to order a transfer, believing such review available "only when there is an issue of transferability or a substantial claim that the judge has refused to exercise or has usurped judicial power." *Id.* at 447–48 (Friendly, J., concurring). Arguably, a transfer for lack of personal jurisdiction is more amenable to mandamus review than a typical transfer under 28 U.S.C. § 1404(a) for the convenience of parties and witnesses, although we have at least once issued mandamus in the latter circumstance, *see In re Warrick,* 70 F.3d 736, 740–41 (2d Cir.1995). We have acknowledged the availability of review of a transfer order under 28 U.S.C. § 1292(b) when "it is urged that the court considered improper factors in making its decision to transfer." *Red Bull Associates v. Best Western International, Inc.,* 862 F.2d 963, 965 n. 4 (2d Cir.1988); *see Farrell v. Wyatt,* 408 F.2d 662, 665 (2d Cir.1969) ("[W]hen the question is the district court's power [to transfer], a proper—although not exclusive—procedural approach is to seek an interlocutory appeal under 28 U.S.C. § 1292(b).").

Where a transfer request has been rejected, our Court has entertained, but denied, a petition for mandamus to compel a transfer. *See Lykes Bros. Steamship Co. v. Sugarman,* 272 F.2d 679, 682 (2d Cir.1959).

*Practice and Procedure* § 3855, at 488–89 (2d ed.1986). The failure to seek mandamus review of an interlocutory ruling does not forfeit the opportunity to obtain review on appeal from a final judgment. *See* 19 *Moore* § 203.32[3][b]; *cf. Arthur v. Nyquist,* 547 F.2d 7, 9 (2d Cir.1976) (interlocutory appeal permissive, not mandatory).

### 2. Review in the Transferee Circuit

■ In the transferee circuit, review of a transfer order is available upon appeal from a final judgment. *See Magnetic Engineering & Manufacturing Co. v. Dings Manufacturing Co.,* 178 F.2d 866, 869 (2d Cir.1950) (L. Hand, C.J.). Judge Frank, who dissented in *Magnetic Engineering* because he would have reviewed the transfer order by mandamus, understood the majority opinion to recognize the possibility that the transferee court of appeals could issue mandamus to direct a retransfer. *See id.* at 871 (Frank, J., dissenting in part).

### 3. Need for a Motion to Retransfer

■ Most Circuits have held that in order to preserve the opportunity for review of a transfer order in the transferee Circuit, a party must move for retransfer in the transferee district court. *See FDIC v. McGlamery,* 74 F.3d 218, 221 (10th Cir. 1996); *United States v. Copley,* 25 F.3d 660, 662 (8th Cir.1994); *Brock v. Entre Computer Centers, Inc.,* 933 F.2d 1253, 1257 (4th Cir.1991); *Moses v. Business Card Express, Inc.,* 929 F.2d 1131, 1136 (6th Cir.1991); *National–Standard Co. v. Adamkus,* 881 F.2d 352, 356 (7th Cir.1989); *Nascone v. Spudnuts, Inc.,* 735 F.2d 763, 766 (3d Cir.1984); *Roofing & Sheet Metal Services, Inc. v. La Quinta Motor Inns, Inc.,* 689 F.2d 982, 989 (11th Cir.1982); *cf. Hill v. Henderson,* 195 F.3d 671, 677 & n. 2 (D.C.Cir.1999) ("If the party transferred

against its will to a new court failed to move for retransfer, the omission *might* waive any claim on the subject.") (emphasis added). *But see American Fidelity Fire Insurance Co. v. United States District Court,* 538 F.2d 1371, 1377 n. 4 (9th Cir.1976) ("On appeal from a final judgment we may exercise our appellate jurisdiction to review a district court's transfer order, even if the transferor court is not within our circuit."). *See generally* 17 *Moore* § 111.64[2][b]. The rationale for this rule is that a court of appeals normally has no jurisdiction to review the decision of a district court in another circuit, but may review a ruling by the transferee court denying retransfer. *See Roofing & Sheet Metal Services, Inc.,* 689 F.2d at 986 (citing 28 U.S.C. § 1294(1), which provides that, with exceptions not relevant to this case, "appeals from reviewable decisions of the district and territorial courts shall be taken to the courts of appeals . . . [f]rom a district court . . . to the court of appeals for the circuit embracing the district"); *Purex Corp. v. St. Louis National Stockyards Co.,* 374 F.2d 998, 1000 (7th Cir. 1967) (noting the lack of a motion to retransfer); *Preston Corp. v. Raese,* 335 F.2d 827, 828 (4th Cir.1964) (noting the lack of a "motion for remand").

■ The Second Circuit has not ruled on whether a transfer order may be reviewed on appeal from a final judgment without a request in the transferee district court for retransfer. In *D'Ippolito,* we noted that a transfer order of a district court in this Circuit would be reviewable in the transferee Circuit on appeal from a final judgment if the transferee district court denied a motion to retransfer. *See* 401 F.2d at 765. We thus contemplated a retransfer motion, but did not then explicitly require one.[6] With the issue now before us, we think a retransfer motion should be required. Once the case has

---

**6.** The efficacy of a retransfer motion to preserve the transfer issue for review on appeal from a final judgment was placed in some doubt by dictum in *Kotlicky v. United States Fidelity & Guaranty Co.,* 817 F.2d 6, 7 n.1 (2d Cir.1987). On appeal from the denial of a

Rule 60(b) motion to vacate a final judgment (an appeal that does not bring up for review the rulings that preceded entry of the judgment, *see Branum v. Clark,* 927 F.2d 698, 704 (2d Cir.1991)), we properly declined to review the denial of a retransfer motion (which

been transferred, subsequent developments might make retransfer appropriate, and the requirement of a retransfer motion obliges the party opposing the initial transfer to make clear that its opposition in the transferor court was serious, and affords the transferee court an opportunity to assess the then-current circumstances.[7] However, since we have not imposed such a requirement in the past and since the Estate does not claim that the lack of a retransfer motion forfeits SongByrd's opportunity for review, we will entertain SongByrd's challenge to the transfer ruling.

■■■ The Estate challenges the reviewability of the transfer order only on the ground that SongByrd's notice of appeal does not explicitly refer to that order. This ground for challenge lacks merit. The notice of appeal recites that SongByrd is appealing from "the Memorandum–Decision and Order, entered 21 October, 1998, granting Defendant's Motion for Summary Judgment," *see* Fed. R.App. P. 3(c)(1)(B) (notice of appeal must designate the judg-

ment, *order,* or part thereof being appealed) (emphasis added). Upon entry of this Order, the Clerk's Office inadvertently neglected to prepare and enter a judgment, but the absence of a separate judgment document may be waived, *see Bankers Trust Co. v. Mallis,* 435 U.S. 381, 387–88, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), and a party may (but is not required to) appeal from a dispositive order without awaiting entry of judgment, *see United States v. Interlink Systems, Inc.,* 984 F.2d 79, 82 (2d Cir.1993). Just as a notice of appeal from a final judgment brings up for review all reviewable rulings "which produced the judgment," 20 *Moore* § 303.21[3][c], at 303–47, a dispositive order clearly intended to end a litigation should have a similar effect, *see Badger Pharmacal, Inc. v. Colgate–Palmolive Co.,* 1 F.3d 621, 626 (7th Cir.1993).[8]

### 4. The Requisite Showing to Reverse a Transfer Ruling After Final Judgment

■■■ Courts discussing review of transfer rulings after entry of a final judgment

---

**7.** A district court considering a retransfer motion might be limited by "law of the case" principles, at least in the absence of changed circumstances. *See Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) ("[T]he policies supporting the [law of the case] doctrine apply with even greater force to transfer decisions than to decisions of substantive law; transferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation.").

would have been available for review on appeal from the judgment). However, we said that review of the retransfer denial was unavailable because such rulings "are interlocutory and not appealable except by certification under 28 U.S.C. § 1292(b), or by petition for mandamus." *Id.* (citations omitted). That dictum was correct only to the extent of noting the unavailability of *interlocutory appeal* of transfer orders; it was incorrect in suggesting that *review* of a retransfer order was unavailable on appeal from a final judgment. The dictum did not reckon with *D'Ippolito*'s contemplation of such review. *See D'Ippolito,* 401 F.2d at 765. We decline to elevate that dictum to a holding.

Compare *Hill,* 195 F.3d at 677 ("[A]t the time of a motion to retransfer the transfer order would be law of the case binding the second district court (in the absence of clear error or manifest injustice....")), *Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1518 (10th Cir.1991), *and Nascone,* 735 F.2d at 765–66, *with Roofing & Sheet Metal Services, Inc.,* 689 F.2d at 989 ("Although ... a district court cannot perform an appellate function by directly reviewing the decisions of another district court, there is nothing to prevent [the transferee district court] from independently considering a motion to retransfer."). On appeal, however, a court of appeals reviewing the denial of a retransfer motion would not be limited by the law of the case, as announced by the transferor district court. *See Christianson,* 486 U.S. at 816–17, 108 S.Ct. 2166; *Hill,* 195 F.3d at 677; *Nascone,* 735 F.2d at 772 n. 9.

**8.** A notice of appeal that explicitly refers to only one ruling antecedent to either a final judgment or a dispositive order might limit reviewability to the referenced ruling, *see Shrader v. CSX Transportation, Inc.,* 70 F.3d 255, 256 (2d Cir.1995), but this limitation will not always occur, *see United States v. Vazquez,* 145 F.3d 74, 79 (2d Cir.1998).

have not always distinguished between two closely related concepts: (1) the standard of review to be applied to the decision granting or denying transfer (or the decision of a transferee court denying retransfer), and (2) the showing required to reverse a transfer ruling. Although a transfer order for the convenience of parties or witnesses under section 1404(a) is reviewed for abuse of discretion, *see Filmline (Cross–Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513, 520 (2d Cir.1989); 17 *Moore* § 111.63, a ruling on personal jurisdiction is accorded plenary review, *see Chaiken v. VV Publishing Corp.*, 119 F.3d 1018, 1025 (2d Cir.1997); 17 *Moore* § 111.63, and a transfer order entered because of lack of personal jurisdiction over the defendant should therefore receive plenary review.[9] *Cf. Chaiken,* 119 F.3d at 1025, 1030–31 (plenary review accorded personal jurisdiction issue in order to determine whether law of transferor jurisdiction applied). Thus, with respect to the transfer ruling in the pending case, which was entered solely because the Louisiana court ruled that it lacked personal jurisdiction over the Estate, plenary review is warranted.

██ To obtain reversal of a transfer ruling (whether granting or denying trans-

fer) after entry of a final judgment, the party urging reversal faces a formidable task. In the context of a motion to transfer for the convenience of parties or witnesses, we have indicated that the party complaining of lack of a transfer would have to "show that a different result would have been reached had the suit been transferred," *Filmline,* 865 F.2d at 520 (internal quotation marks omitted) (quoting *Ford Motor Co. v. Ryan,* 182 F.2d 329, 330 (2d Cir.1950)), and the party opposing a transfer that was ordered would similarly have "to show that it lost the case because of the handicap of the transfer," *Magnetic Engineering,* 178 F.2d at 869 (discussing burden to be faced in the transferee circuit). With respect to a transfer based on lack of personal jurisdiction, the party opposing the transfer must similarly demonstrate at least a high likelihood that the outcome of the litigation in the transferor court would have been different from the outcome in the transferee court, different not because of speculative concerns about the likely predisposition of local judges and juries, but because of substantive differences in outcome-determinative law applicable to an issue governed by state law.[10] Such differences in substantive law

**9.** At one time, our Court ruled that a district court lacking personal jurisdiction had no power to transfer, *see Goldlawr, Inc. v. Heiman,* 288 F.2d 579, 586 (2d Cir.1961), but the Supreme Court reversed that ruling and made clear that a district court lacking both personal jurisdiction and proper venue could transfer under section 1406(a) to a district where both defects were avoided, *see Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962). Thereafter, we ruled that, whether or not venue was proper, lack of personal jurisdiction could be cured by transfer to a district in which personal jurisdiction could be exercised, with the transfer authority derived from either section 1406(a) or section 1404(a). *See Corke v. Sameiet M.S. Song of Norway,* 572 F.2d 77, 80 (2d Cir.1978) (adopting Judge Weinfeld's view in *Volk Corp. v. Art–Pak Clip Art Service,* 432 F.Supp. 1179, 1181 & nn. 4–5 (S.D.N.Y.1977)). *See generally* 17 *Moore* § 111.02[1][b].

The Tenth Circuit has ruled that authority to transfer for lack of personal jurisdiction is

provided by 28 U.S.C. § 1631 (1994), *see Viernow v. Euripides Development Corp.*, 157 F.3d 785, 793 (10th Cir.1998), but the legislative history of section 1631 provides some reason to believe that this section authorizes transfers only to cure lack of subject matter jurisdiction. *See* S.Rep. No. 97–275, at 30 (1982), *reprinted in* 1982 U.S.C.C.A.N. 11, 40 ("Section 301 [section 1631] adds a new chapter to title 28 that would authorize the court in which a case is improperly filed to transfer it to a court where subject matter jurisdiction is proper."); *Levy v. Pyramid Co. of Ithaca,* 687 F.Supp. 48, 51 (N.D.N.Y.1988) (Section 1631 limited to subject matter jurisdiction transfers), *aff'd without consideration of this point,* 871 F.2d 9 (2d Cir.1989).

**10.** A defendant disputing personal jurisdiction in the transferor court would presumably not seek a transfer but would seek dismissal, as the Estate did here. Upon dismissal, the plaintiff-appellant would have to show only that personal jurisdiction existed, and no

are relevant because in a transferred action the law of the transferor jurisdiction applies, *see Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), only if the transferor court has personal jurisdiction, *see Chaiken*, 119 F.3d at 1030; *Levy v. Pyramid Co. of Ithaca*, 871 F.2d 9, 10 (2d Cir.1989).[11]

Thus, in the pending case, if SongByrd's claim would be time-barred under the law of both Louisiana and New York, it would have no complaint that personal jurisdiction was ruled lacking in Louisiana. In that event, we would not need to review Judge Porteous's jurisdiction ruling. On the other hand, if Louisiana law accords SongByrd a more generous limitations period than New York, or at least affords it a significantly greater opportunity to demonstrate that its claim is not time-barred, then we would need to determine whether personal jurisdiction in Louisiana was lacking, because the more favorable substantive state law is applicable only if personal jurisdiction exists in Louisiana.[12]

We could pause at this point and discuss fully whether SongByrd's claim survives in Louisiana but encounters a time bar in New York, but the opinion will unfold more coherently if we turn to the issue of personal jurisdiction, noting now only that the Fifth Circuit has already given Song-Byrd substantial reason to believe that its

claim is not time-barred in Louisiana, and that our subsequent discussion, *see* Part III, *infra*, will rule that the claim is time-barred in New York.

## II. Personal Jurisdiction[13]

■ Whether the Estate is subject to long-arm jurisdiction in Louisiana with respect to SongByrd's cause of action depends on whether Grossman would have been subject to such jurisdiction during his lifetime. That proposition is not self-evident,[14] and was at one time not the law, *see McMaster v. Gould*, 240 N.Y. 379, 388, 148 N.E. 556 (1925); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 1565, at 479, but is true in most jurisdictions today, *see id.*, at least as to causes of action arising out of activity of a decedent within the forum state, provided the forum state extends its long-arm statute to executors for such causes of action. *See United States v. Montreal Trust Co.*, 358 F.2d 239, 241 (2d Cir.1966); *Rosenfeld v. Hotel Corp. of America*, 20 N.Y.2d 25, 281 N.Y.S.2d 308, 228 N.E.2d 374 (1967) (upholding constitutionality of N.Y. C.P.L.R. 302(a) (McKinney 1990)).

■ Long-arm jurisdiction over an executor with respect to a cause of action against a decedent arising from activity within the state exists in Louisiana. *See*

choice of law issue would arise. In the pending case, the transfer was ordered *sua sponte* by Judge Porteous.

11. In *Chaiken*, the transfer ruling itself was unopposed, *see* 119 F.3d at 1030, but, on appeal from a final judgment, the appellant claimed that personal jurisdiction over the defendant would have been proper in the transferor district, not to secure a retransfer, but solely to have the benefit of the substantive law of the transferor jurisdiction.

12. If personal jurisdiction existed in Louisiana (as well as in New York), we would then face the issue whether to order a retransfer to Louisiana or to decide the case here under applicable (though unfamiliar) Louisiana law.

13. SongByrd did not argue before Magistrate Judge Homer that personal jurisdiction was

available in Louisiana, but, since we have excused the failure to make a retransfer motion, the personal jurisdiction issue has not been forfeited. In the District Court, the retransfer motion would have turned on whether personal jurisdiction existed in Louisiana. Without the need (in this case) for a retransfer motion, SongByrd was entitled to think that it could challenge the Louisiana Court's jurisdiction ruling on appeal from a final judgment without re-presenting the issue to the District Court here.

14. Though an estate is liable for the debts of the decedent, it is arguable that, since it has succeeded to the interests of the decedent by operation of law and the fortuities of life, rather than by choice (such as in a corporate acquisition), it should not be required to defend the decedent's interests in a foreign forum.

La.Rev.Stat. Ann. § 13–3201 (West 2000) (extending jurisdiction, where otherwise applicable, to "nonresident"); *id.* § 13–3206 (defining "nonresident" to include an "executor, administrator, or other legal representative" of an individual).

The parties agree that Louisiana's personal jurisdiction statute has regularly been interpreted by the Louisiana courts to reach as far as the Due Process Clause permits. *See, e.g., Superior Supply Co. v. Associated Pipe and Supply Co.*, 515 So.2d 790, 792 (La.1987). Thus the issue is whether Grossman's contacts with Louisiana sufficed to satisfy due process requirements.[15]

Grossman's contacts with Louisiana, relevant to this lawsuit, are extremely scant. He was never in Louisiana. In New York, he heard demo tapes that had been made in Louisiana, contacted Byrd and Byrd's managers in Louisiana, and invited them to come to New York to make recordings. The recordings were unsatisfactory, and thereafter Byrd's managers sent the master tapes to Grossman in New York. Nothing in the record (apart from an unsupported allegation in the complaint) suggests that the master tapes were sent at Grossman's request. Grossman retained possession of the master tapes, without any contact with Byrd or his managers and without any activity in Louisiana. The invitation to Louisiana residents to come to New York to make recordings is far too insubstantial a contact to support personal jurisdiction with respect to a cause of action for wrongful possession of master tapes that the residents later sent to Grossman. Although the suit concerns ownership of a chattel (the master tapes) made in Louisiana by a Louisiana resident, Grossman did not obtain the tapes in Louisiana, or take any action in Louisiana that caused the tapes to be sent to him. Although his invitation

to Byrd and his managers to come to New York to make recordings can be viewed as a "but for" cause of the eventual shipment of the demo tapes to New York, there was no necessary or even likely connection between these events, and the connection is too tenuous to satisfy the "specific jurisdiction" component of due process analysis. *See Metropolitan Life Insurance Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir.1996). The "general jurisdiction" component, which requires continuous and systematic general business contacts with the forum, *see id.* at 568, is not remotely satisfied.

Since personal jurisdiction was lacking in Louisiana, the transfer was properly ordered.

### III. Statute of Limitations

■ With the Northern District of New York properly regarded as the forum state after the valid transfer for lack of personal jurisdiction in Louisiana, there can be no doubt that New York's statute of limitations determines whether Song-Byrd's suit, alleging a wrongful conversion of a chattel in New York, is time-barred. *See Levy*, 871 F.2d at 10. The parties do not claim otherwise. Nor do they dispute that the relevant statute is the three-year limitations period for conversion and recovery of chattels. *See* N.Y. C.P.L.R. § 214(3) (McKinney 1990). Their dispute concerns the time when SongByrd's cause of action accrued. The Estate contends, as the District Court ruled, that under New York law the limitations period for conversion begins to run at the time of the conversion. The District Court found that the conversion occurred when the Estate licensed the master recordings in 1986, well beyond the limitations period.

Three decisions bear on the accrual issue. In *Sporn v. MCA Records, Inc.*, 58 N.Y.2d 482, 462 N.Y.S.2d 413, 448 N.E.2d

---

**15.** SongByrd urges that we certify this question to the Louisiana Supreme Court. *See* Brief for Appellant at 10–14. Since the issue involves application of federal due process requirements, rather than any dispute about the meaning of Louisiana law, certification is not warranted.

1324 (1983), the New York Court of Appeals considered whether a cause of action for conversion accrued when the possessor "first began using plaintiff's property as its own," *id.* at 484, 462 N.Y.S.2d at 414, 448 N.E.2d 1324, or whether a new cause of action accrued each time the defendant used the property the plaintiff claimed to own. The property was a master recording. The Court of Appeals ruled that the plaintiff had only a single cause of action (for conversion) and that it accrued when the defendant began "commercially exploiting" the property as its own. *See id.* at 489, 462 N.Y.S.2d at 416, 448 N.E.2d 1324.

In *Solomon R. Guggenheim Foundation v. Lubell*, 77 N.Y.2d 311, 567 N.Y.S.2d 623, 569 N.E.2d 426 (N.Y.1991), the Court of Appeals considered a replevin claim by a New York City museum against a good-faith purchaser for return of a painting that had been stolen from the museum. The principally disputed issue was whether the plaintiff's cause of action did not accrue until the plaintiff made a demand upon the possessor for return of the painting and the demand was refused, or whether the plaintiff's lack of due diligence in locating the painting resulted in the cause of action accruing at some earlier time. The Court applied New York's rule that "a cause of action for replevin against the good-faith purchaser of a stolen chattel accrues when the true owner makes demand for return of the chattel and the person in possession of the chattel refuses to return it." *Id.* at 317–18, 567 N.Y.S.2d at 626, 569 N.E.2d 426. *Lubell* rejected a requirement that the claimant to ownership exercise due diligence in locating its chattel, but acknowledged the New York rule that an owner, "having discovered the location of its lost property, cannot unreasonably delay making demand upon the person in possession of that property." *Id.* at 319, 567 N.Y.S.2d at 627, 569 N.E.2d 426 (citations omitted). Lack of diligence in locating the property was to be consid-

ered only with respect to a laches defense. *See id.* at 321, 567 N.Y.S.2d at 628, 569 N.E.2d 426.

In *Hoelzer v. City of Stamford*, 933 F.2d 1131 (2d Cir.1991), we considered the City of Stamford's claim to recover W.P.A. murals that had once adorned the walls of the Stamford High School. Claiming ownership, the City brought a replevin action to recover the murals from Hoelzer, to whom the General Services Administration had delivered them in 1971 for storage and restoration. The City of Stamford was initially unaware of Hoelzer's possession of the murals and, even after becoming aware, did not know that he was claiming ownership until 1986, within three years of the lawsuit, at which point the City demanded their return. This Court applied *Lubell* and ruled that under New York's demand-and-refusal rule, the City's claim was timely. *See id.* at 1137. Although *Lubell* had involved a stolen chattel in possession of a good-faith purchaser, *Hoelzer* applied the *Lubell* demand-and-refusal rule to artwork that was not stolen and that was in possession of a custodian. Since New York used the demand-and-refusal rule to delay the accrual of the claim of the true owner even against a good-faith purchaser, *Hoelzer* understandably applied the rule to protect the true owner against a mere bailee who had not, prior to demand and refusal, acted to assert ownership.

*Sporn* bars SongByrd's claim. Like the possessor in that case, the Estate began using the master tapes as its own when it licensed portions of them to Rounder in 1986. *See Jaywyn Video Productions, Ltd. v. Servicing All Media, Inc.*, 179 A.D.2d 397, 577 N.Y.S.2d 847 (1st Dep't 1992) (licensing of films by library holding them constituted conversion). The conversion alleged by SongByrd occurred no later than that date.[16] The demand-and-refusal rule, which functioned to delay accrual of the claim in *Lubell* and *Hoelzer* for the benefit of the true owner, normally

16. Other portions of the master tapes were licensed to Rhino in 1991.

provides some benefit to the good-faith possessor by precipitating its awareness that continued possession will be regarded as wrongful by the true owner. *See* Ashton Hawkins *et al., A Tale of Two Innocents: Creating an Equitable Balance Between the Rights of Former Owners and Good Faith Purchasers of Stolen Art,* 64 Ford. L.Rev. 49, 69–70 (1995). New York has not required a demand and refusal for the accrual of a conversion claim against a possessor who openly deals with the property as its own.

Even if a demand were required for accrual of SongByrd's claim, *Lubell* instructs that a plaintiff may not unreasonably delay in making a demand for property whose location is known. Byrd, either independently or through his agents, had known since the 1970s that the master tapes were in Grossman's possession, and the unanswered letters to Grossman in 1975 for return of the master tapes probably sufficed to alert him to Grossman's disregard of his ownership claim, thereby rendering any demand thereafter unreasonably delayed. In any event, his successors' delay in not making a demand in 1987, when Bearsville's licensing of the master tapes became well known in the music world as a result of the Grammy Award for Byrd's recordings, was clearly unreasonable.

Where required, the demand-and-refusal rule "change[s] the character" of a good-faith possession before an action for conversion or recovery of a chattel can be maintained.[17] *See Goodwin v. Wertheimer,* 99 N.Y. 149, 152, 1 N.E. 404 (1885) (cited with approval in *Lubell,* 77 N.Y.2d at 318, 567 N.Y.S.2d at 626, 569 N.E.2d 426). As in *Sporn,* however, no demand and refusal was needed here since the "character" of Bearsville's possession had changed by its actions in treating the master tapes as its own.

---

17. SongByrd insists that it is not alleging "conversion," only a "bailment of indefinite duration," Brief for Appellant at 25–26, which must now be ended. But whether or not it uses the label "conversion," its complaint alleges facts that demonstrate that Bearsville used the tapes as its own, thereby converting them (even on the assumption that SongByrd's ownership interest continued up to the point of the conversion).

## Conclusion

Because the Appellant's claim is time-barred, the order of the District Court is affirmed.